John CARTER d/b/a Carter
Real Estate

v.

Maria PATRICK.

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Sept. 22, 2004 Session.

Oct. 18, 2004.

Permission to Appeal Denied by
Supreme Court March 21, 2005.

Francis Xavier Santore, for the Appellant, Maria Patrick.

William S. Nunnally, for the Appellee, John Carter d/b/a Carter Real Estate.

## OPINION

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. and D. MICHAEL SWINEY, J., joined.

This is a suit brought by a real estate broker against a client for a commission which he claimed she owed him under a listing agreement to sell real property belonging to her. Client alleged that, in order to induce her to enter into the listing agreement, the broker had promised to make mortgage payments due on her property, that broker subsequently discontinued making these payments and that, as a result, her property was placed at risk of foreclosure, and she was thereby compelled to sell the property at a price lower than the price set forth in the listing agreement with broker. Client alleged that, in consequence of broker's failure to continue making the mortgage payments he was in breach of contract and guilty of fraud. Client further alleged that broker breached their agreement by failing to properly maintain the property. The trial court held that the broker did not fail to meet his obligations under the parties' agreement with respect to either the payment of the landowner's mortgage or the maintenance of the subject property and was not in breach of their agreement or guilty of fraud. Accordingly, the trial court awarded broker a commission in the amount of $13,600.00, along with pre-judgment interest in the amount of $1,497.86. We affirm the judgment of the trial court and remand for collection of costs.

Plaintiff/Appellee, John Carter d/b/a Carter Real Estate, was, at all times relevant to the matters herein, engaged in the business of listing and selling real estate in Greene County, Tennessee. In November of 1998, Appellee auctioned property consisting of approximately 29 acres, improved with a house and miscellaneous farm structures, to Defendant/Appellant, Maria Patrick; Appellant's daughter, Kelly Harris; and Ms. Harris's husband, Christopher A. Harris. The purchase price of the property at the time of auction was $131,000.00. At the same time the property was purchased, Appellant, her daughter and son-in-law signed a deed of trust pursuant to which the property secured indebtedness to a mortgage company in the amount of $98,250.00.

At some time in the summer of 2000, Appellant, her daughter and son-in-law decided to sell the property and Kelly Harris contacted Gary Carter, an employee/agent of Appellee, and requested that Appellee list the property for sale. After an inspection of the property, Appellee offered to list it at a maximum price of $159,000.00. This offer was refused by Ms. Harris and the Appellee declined the listing. Thereafter, the property was listed with another local realty company at a price of $199,000.00. The property remained listed with this company until expiration of the listing agreement in October of 2001, whereupon Kelly Harris contacted Gary Carter and requested that he view the property once again and reconsider listing it. Mr. Carter again viewed the property; however, the parties could not agree to a listing price and, as before, Appellee declined the listing.

Later in October of 2001, Appellant contacted Gary Carter and advised him that there were no longer funds available to make the mortgage payments on the property and that it was at risk of foreclosure. Mr. Carter testifies that Appellant advised him that, in addition to the mortgage on the subject property, she was confronting other debts in Florida, where she then resided, and that her daughter, Kelly Harris, had taken financial advantage of her. Mr. Carter testifies that he felt sorry for Appellant and told her that "we would

catch [the mortgage] payments up, keep [the property] out of foreclosure and try to get the property sold in a reasonable length of time." Mr. Carter's testimony further indicates that because of Appellant's pressing financial problems there was a need to sell the property quickly. "I thought at [$159,000.00] we had a chance to get something—an offer close to that and maybe get it sold for her at a reasonable length of time; and if not, sell it at auction for her."

Shortly after this meeting between Appellant and Mr. Carter, Kelly and Christopher Harris quitclaimed their interest in the property to Appellant, whereupon, she became the sole owner of the property.

Pursuant to the discussions between Appellant and Gary Carter described above, on November 6, 2001, Gary Carter prepared and forwarded to Appellant three documents—a cover letter, a listing contract and an addendum to the listing contract.

The cover letter is addressed to Appellant and provides as follows:

Dear Maria:

Enclosed is a listing contract for your property located at 2025 Marvin Road, along with a separate agreement authorizing Carter Real Estate to make payments on your behalf. Please sign all the documents in the designated areas and return them to me. As soon as I receive the signed papers, I will contact the mortgage company and make arrangements to keep the property out of foreclosure. Remember to contact the mortgage company and instruct them to give me any information that I may need concerning your mortgage.

Thank you for allowing me to represent you in this transaction, and we will do our best to get you top dollar for your property.

If you have any questions, please give me a call.

Sincerely,

Gary Carter

The listing contract sets forth a listing price of $159,000.00 and provides that Appellee shall have the exclusive right to sell the property at issue. The contract further provides that Appellee shall receive a commission of ten per cent if the property is sold during the period of the contract which is described as commencing on November 7, 2001 and expiring on November 7, 2002.

The addendum to the listing contract is brief and provides in full as follows:

November 6, 2001

To Whom It May Concern:

I, Maria F. Patrick, hereby authorize Carter Real Estate & Auction Company to make payments on my behalf, i.e. mortgage payments, property clean-up, repairs, and any necessary deed and title work required, and deduct the reimbursement for those expenses from the proceeds of the sale of my property located at 2025 Marvin Road, Bulls Gap, Tennessee.

I further agree that Carter Real Estate & Auction Company will be the exclusive agent for the sale of the above mentioned property until it is sold, either by privately negotiated sale, or as a last resort, at a public auction sale.

Carter Real Estate & Auction Company agrees to perform only the repair and clean-up it deems necessary to make the property presentable to sell and achieve the highest possible sales price at the least cost to the seller.

Maria F. Patrick Date Gary Carter Date

Both the listing contract and the addendum were subsequently signed by Appellant and by Gary Carter as Appellee's agent. Appellant also put Appellee in con-

tact with her mortgage company, Litton Loan Servicing, and arranged for them to provide Appellee with any requested information regarding her mortgage.

Kelly Harris and her husband had resided on the property since the time of purchase and continued to reside there at the time of the above interchange between Mr. Carter and Appellant. By this time the relationship between the Harrises and Appellant was in a state of deterioration. By letter dated November 6, 2001, Appellant advised Kelly Harris that she understood that the Harrises intended to vacate the property within fifteen days and that they were not to remove anything from the house "such as fans or plumbing or anything that is screw[ed] down or nailed down."

The Harrises subsequently moved out of the property after which Gary Carter further inspected the interior and exterior of the residence. Evidence was presented that the appearance of the house's interior "was really bad"—that there was a significant amount of garbage and trash in the house and that there were urine stains and animal fecal matter on the carpet. Gary Carter also testified that the exterior of the buildings and grounds had deteriorated considerably since 1998.

Appellee had the property cleaned so that it could be shown to prospective purchasers and, as of December 12, 2001, had made all mortgage payments then due on the property.

At some time in late January or early February of 2002, Appellant contacted Gary Carter and demanded that the listing price of the property be increased from $159,000.00 to $169,000.00. Gary Carter attests that, although he advised Appellant that he did not think there was a chance of selling the property at the increased price, Appellant was insistent and, therefore, he prepared a form which changed the listing

price to $169,000.00 and mailed it to Appellant for her signature. However, Appellant never executed this form. At the same time that Appellant told Gary Carter that she wanted to increase the listing price of the property to $169,000.00, she also informed him that she would need to realize a net profit of $35,000.00 from the sale because that is the sum that she would require to pay off some debts in Florida.

Appellee asserts that Appellant's artificial needs and goals bore no relation to the property's value and that this indicated to him that Appellant was unlikely to reasonably entertain good purchase offers which might be forthcoming. Appellant states, that for this reason, he discontinued making mortgage payments although he continued to show and market the property. At trial Appellee testified as to his reaction to Appellant's insistence that the listing price of the property be raised to $169,000.00 after Appellee had advanced $3,135.00 to bring the mortgage payments current and had incurred additional expenses in the amount of $1,708.51 for cleanup of the property and for preparation and recordation of the quitclaim deed from the Harrises:

A. My money's been spent, the payments have been made, and we're attempting to sell it. Then I'm informed by Gary [Carter] we can no longer sell it for 159, Maria has changed her mind and gone to 169, which threw up red flags.

Q. And why is that? Why did, in your opinion, that complicate matters?

A. I might have to keep it out of foreclosure forever. If we got a 1–69 offer, she might go to 1–79. And I couldn't force her to sign a deed, so it was a—

Q. Significant change?

A. —that was an eyebrow-raiser. Yes, it was.

Q. Increased your risk significantly. Would you have accepted the listing had you known that she was going to insist on a 1–69 asking price?

A. No, I wouldn't.

Q. So now you're stuck. You've got a 159 agreement, you've spent money, wouldn't have taken a 169 listing, and she calls and demands that it be increased to 169, and you're trapped.

A. We're trapped. That's right.

Q. So as a result of that, did you just give up, or did you just go ahead and try to market in hopes you can—or to get it worked out.

A. Actually, we just about redoubled our efforts to get the farm sold. Because at that time, I saw what I thought was coming down the pike, and I wanted to get it up and over with and hunt a buyer and close it and get our commission, get her loan paid off and—because I knew my ground was shaky right there.

Around this period of time Appellee, through an affiliate seller, was negotiating with Jeff and Kristi Cattrell who were considering purchasing the property. Evidence shows that on April 12, 2002, the Cattrells offered to purchase the property for $145,000.00. This offer was rejected by Appellant who presented them with a counter offer of $165,000.00. The Cattrells then offered $152,000.00 which was also rejected by Appellant who presented a counter offer of $160,000. Finally, on May 7, 2002, the Cattrells offered $155,000.00; however, Appellant declined this offer, also.

After receiving the Cattrells' offer of $155,000.00, Appellant contacted Litton Loan Servicing for information as to what her net profit would be in the event the property were sold, whereupon, she discovered that mortgage payments had been discontinued and foreclosure of the property was imminent.

In addition to the Cattrells, another couple, Greg and Sheila Harrison, also expressed an interest in purchasing the house during this period of time. It was the Harrisons' intent to purchase Appellant's property on a contingency basis whereby they would have Appellee list their own property for sale and use the proceeds from its sale to purchase Appellant's property. However, upon inspection of the Harrisons' property Appellee determined that its value was approximately the $110,000.00 which was owed upon it. Appellee testified that, because this amount was significantly less than the $169,000.00 to $179,000.00 the Harrisons wanted for their property he declined the listing and concluded that the Harrisons' proposal would not satisfy the need to sell Appellant's property quickly. Thereafter, the Harrisons were contacted directly by Appellant who stated that she advised them "that because [Appellee] had failed to make the mortgage payments and keep the house out of foreclosure, she considered the contract breached, and void." Discussions ensued between Appellant and the Harrisons regarding terms under which they might purchase the house; however, an agreement was never reached. When Appellee discovered that Appellant was attempting to negotiate a sale of the property without his involvement, he contacted the Harrisons and advised them that, because he had a listing contract with Appellant, any negotiations would have to be done through his company.

On May 24, 2002, notice was published that a foreclosure sale of Appellant's property would be held on June 14, 2002. At Appellee's instruction Gary Carter re-contacted the Cattrells who presented a pur-

chase offer of $159,000.00 contingent upon a satisfactory walk-through inspection of the property. Appellant agreed to this offer and the foreclosure sale was postponed upon notification of the mortgage company. However, upon the walk-through inspection of the property it was discovered that door knobs, latches and bathroom cabinets were missing. Also missing were ceiling fans and tin from the roof of the horse stable which Appellant testified she had given Kelly Harris permission to remove. As a result of the walk-through inspection, the Cattrells withdrew their offer to purchase the property.

After the sale to the Cattrells fell through, the Defendant contracted with Massengill Auction Company to sell the property and on September 19, 2002, the property was sold at auction for $136,000.00.

On May 28, 2002, Appellee filed suit against Appellant in the Greene County Chancery Court alleging that Appellant had breached the parties' agreement with respect to the sale of her property. By amended complaint filed on October 13, 2003, Appellee alleged, *inter alia*, that the Cattrells would have purchased Appellant's property for the $159,000.00 sum set forth in the listing agreement but for the fact that items had been removed from the property by an agent of Appellant. Accordingly, the complaint requests that Appellee be awarded a ten percent commission based upon the sales price of $159,000.00.

By agreed order entered December 9, 2002, $4,841.51 of the proceeds realized from the auction of the property were disbursed to Appellee as reimbursement of expense, including mortgage payments, which had been incurred by him relative to the property. The order further provided that $15,500.00 be placed in the Chancery Court registry account pending further orders of the Court. Remaining proceeds from the sale were used to pay the mortgage, a commission to Massengill Auction Company and other expenses of the sale.

Trial of Appellee's suit for a commission was held on October 15, 2003, after which the Chancery Court rendered its memorandum opinion and final judgment in favor of Appellee and granting Appellee damages in the amount of $15,097.86 representing $13,600.00 compensatory damages for breach of contract reflecting a ten per cent commission based upon the $136,000.00 received at auction, along with pre-judgment interest in the amount of $1,497.86. Thereafter, Appellant timely filed the appeal now before us.

Appellant raises four issues for our review:

I. Whether Appellee violated his fiduciary duty to Appellant and is for that reason not entitled to a sales commission.

II. Whether the Chancery Court erred in finding that one year was an unreasonable time for Appellee to make Appellant's mortgage payments on her property.

III. Whether Appellee breached the listing agreement with Appellant by failing to properly maintain the condition of Appellant's property.

IV. Whether the Chancery Court erred in failing to find that Appellee engaged in fraudulent conduct.

 Our standard of review in this non-jury case is *de novo* upon the record of the proceedings below and there is no presumption of correctness with respect to the Chancery Court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn.1996) and T.R.A.P. 13(d). A trial court's factual findings are, however, presumed to be correct, and we must affirm such findings absent evidence

preponderating to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993). In a non-jury case such as this one the question of witness credibility is exclusively for the trial judge trying the case and cannot be reviewed by the appellate court. *Harwell v. Harwell*, 612 S.W.2d 182, 184 (Tenn.Ct.App.1980).

The first issue we address is whether Appellee violated a fiduciary duty owed to Appellant.

Appellee does not deny that he was in a fiduciary relationship with Appellant, and Tennessee case law does provide that a real estate broker is a fiduciary. *Alexander v. C.C. Powell Realty Co., Inc.*, 535 S.W.2d 154, 155 (Tenn.Ct.App.1975). The fiduciary relationship between an agent, such as Appellee, and his principal imposes "a duty to be careful, skillful, diligent and loyal in the performance of [the] principal's business," and a cause of action for damages arises when there is a breach of this duty. *Thomson McKinnon Securities, Inc. v. Moore's Farm Supply, Inc.*, 557 F.Supp. 1004, 1011 (W.D.Tenn.1983). A real estate broker owes undivided fidelity and faithfulness to his principal and may not prejudice the interests of his principal to favor himself or others. *Reece v. Homestead Realty, Inc.*, 626 S.W.2d 711, 712 (Tenn.Ct.App.1981).

Appellant alleges that Appellee breached his fiduciary duty to her in this case when, after inducing her to execute the listing agreement by promising to keep her property out of foreclosure, he unilaterally discontinued making mortgage payments on the property without notice to her. Appellant argues that because the term of the listing agreement was one year Appellee was obligated to continue making mortgage payments on her property for that period of time. Appellant further contends that, after her property was placed in foreclosure as a result of Appel-lee's actions, Appellee pressured her into taking less than $169,000.00 for the property. Our review of the record compels us to the conclusion that Appellant's argument that Appellee breached his fiduciary duty on these grounds is without merit.

The listing agreement itself contains no reference to Appellant's agreement to make mortgage payments on the subject property. While the addendum to the listing agreement authorizes the Appellee to make mortgage payments on behalf of Appellant, it does not indicate for what period of time these payments are to be made. The cover letter which accompanied these documents states that Appellant "will contact the mortgage company and make arrangements to keep the property out of foreclosure," but contains nothing as to an agreement beyond those specifics. As previously noted, Appellee testified at trial that he advised Appellant that he "would catch [the mortgage] payments up, keep the property out of foreclosure and try to get the property sold in a reasonable period of time." We find nothing in any of this evidence which suggests that Appellee agreed to make mortgage payments on the property for the one year duration of the listing agreement. Rather, our construction of the evidence is that Appellee agreed to make only those mortgage payments necessary to prevent foreclosure of the property. When Appellant approached Appellee in October of 2000, Appellant apparently no longer had the financial ability to pay the mortgage on her property. Appellee subsequently advanced over $3,000.00 of his own funds in satisfying mortgage debt on the property and prevented foreclosure. Thus, Appellee satisfied the full extent of his obligation to Appellant in this regard. We further note that, in fact, there was never a foreclosure of the property in this case. When foreclosure was again impending in May of

2002, Appellee again prevented its occurrence by producing the Cattrells as purchasers offering to purchase the property at its full listing price of $159,000.00. Although a sale to the Cattrells was not consummated, foreclosure was avoided and the property was ultimately auctioned by Massengill Auction Company. Appellant's argument that she was pressured into accepting less than $169,000.00 for the property because Appellee discontinued making mortgage payments is without merit, not only for the reasons stated thus far, but also based upon evidence that Appellant initially agreed to the listing price of $159,000.00, and she subsequently declined to sign documentation prepared by Appellant at her instigation which would have increased the listing price to $169,000.00. Additionally, evidence is before us that during the course of negotiations with the Cattrells, and prior to her discovery that Appellee was no longer paying her mortgage, Appellant made a counteroffer of sale in the amount of $160,000.00—an amount significantly less than the $169,000.00 Appellant implies she would have demanded but for the impending foreclosure and an amount which closely approximates the offer of $159,000.00.

The next issue presented by Appellant is whether the Chancery Court erred in finding that one year was an unreasonable amount of time for Appellee to make the mortgage payments on Appellant's property when the only time restriction contemplated by the parties was one year.

As Appellee correctly points out in his brief, contrary to the assertion of Appellant, the Chancery Court did not make a finding that one year was an unreasonable amount of time for Appellee to make mortgage payments on behalf of Appellant. Based on the evidence presented by the parties, the Chancery Court found, as do we, that the listing agreement does not require that Appellee make mortgage payments for one year but only to the extent necessary to prevent foreclosure. As stated by the Court in its memorandum opinion, "The evidence preponderates in favor of a finding that during the one year term of the listing contract, Plaintiff tendered sufficient payments to prevent foreclosure, and no subsequent foreclosure occurred prior to the public auction conducted by Massengill Auction Company." As we have noted, we are in agreement with this determination.

■ Although Appellant does not designate it as a separate issue in her brief, Appellant next argues that Appellee breached their agreement by not keeping the property properly cleaned and that, as a result, the Cattrells withdrew their offer to purchase the property for $159,000.00 and Appellant had to sell the property for $136,000.00. Appellant asserts that we "should remand this case to the trial court with directions to enter judgment against appellee and in favor of appellant in the sum of $23,000.00: the difference between the price that was not paid because of appellee's *indifference* to its own property, less the amount actually received by appellant through the subsequent sale." (Emphasis in original).

The following testimony of Gary Carter indicates the circumstances which led to the Cattrells' decision to withdraw their purchase offer of $159,000.00:

A ..... Mr. Cattrell went—we made the arrangements—I'm not sure how those arrangements were made—for him to do his walk-through inspection.

Q. And as a result of that walk-through inspection, were problems detected with respect to missing items that had been in the house before that?

A. Yes, there were several missing items.

Q. All right. Based on your—what you had learned, that there were problems with missing items, did you go to the property to see what the problem was?

A. Yes, I did.

Q. And what did you personally observe to be missing?

A. Ceiling fans were gone; doorknobs and latches were gone; bathroom cabinets gone; the tin had been removed from the horse stable.

. . .

Q. After Mr. Cattrell withdrew on account of the fact that things were missing, were you asked by [the Defendant] to do anything more?

A. I don't recall anything else. They offered to reduce the purchase price by $200.00 to make up for the items that were missing.

Q. And was that acceptable to the Cattrells?

A. No. By this point in time he was—totally disillusioned with the whole process. . . . .

Q. Anyway his motive was he had lost trust in the situation. That was the last straw, so to speak. He was out.

A. It failed the walk-through inspection and he ran.

Although it was never conclusively established who was responsible for the removal of some of the missing items, Appellant testified that she herself gave Kelly Harris permission to remove the ceiling fans and the tin from the horse stable. ". . . Take tin, take the ceiling fans. It's going for foreclosure. They're going to get what's owed on the mortgage. I'm going to get nothing. What is the difference?" Furthermore, as the Chancery Court correctly notes in its memorandum opinion, by May of 2002, the lock box placed on the property residence by the Plaintiff had been removed, new locks were in place and other individuals were residing in the property with Appellant's permission. The Court also correctly observes that the listing agreement provides that Appellee is absolved from liability for theft, vandalism or damage to the property during the term of the agreement. In light of all this and upon our review of the record as a whole, we are compelled to conclude that the evidence does not preponderate against the ruling of the Chancery Court that Appellee did not breach his agreement with Appellant with regard to proper maintenance of the property.

The final issue raised by Appellant is whether the Chancery Court erred in failing to find that Appellee committed fraud in his transactions with Appellant.

In *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn.Ct.App.1990), we set forth those elements necessary to maintain a cause of action for fraud:

The basic elements for a fraud action are: (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation falsity-that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to an existing or past fact, or if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise." (Citations omitted)

Appellant, in apparent support of her contention that these elements exist in the present case, asserts that Appellee "procured [her] signature by his promise to make the mortgage payments and keep the house out of foreclosure," that she

"clearly relied upon appellee's promise to make the mortgage payment" and "that appellee had no intention of meeting his contractual obligation to appellant to satisfy the mortgage payments for the duration of the contract."

As we have heretofore indicated in this opinion, it is our conclusion that the evidence does not preponderate against the Chancery Court's ruling that Appellee did satisfy his obligations under the agreement with Appellant as to mortgage payments and the prevention of foreclosure. Appellant's contention that the Appellee misrepresented matters in that regard which she relied on to her detriment is without merit.

For the foregoing reasons we affirm the judgment of the Chancery Court and remand for collection of costs below. Costs of appeal are adjudged against Maria Patrick and her surety for which execution may issue, if necessary.