IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 13, 2005 Session

## RICK A. HUGHES and LISA J. HUGHES v. RICHARD C. POULTON and ANNETTE L. POULTON

An Appeal from the Chancery Court for Wilson County
No. 03261    C. K. Smith, Chancellor

---

### No. M2004-01712-COA-R3-CV - Filed October 25, 2005

---

This is a property dispute between next-door neighbors over a gate across a driveway easement. The two neighbors shared a common driveway from the public road in front of both properties. After a clash between the two neighbors' dogs, one neighbor erected a fence on the boundary line with a gate across the other neighbor's portion of the driveway. This lawsuit followed. The trial court enjoined the defendant neighbor from placing the fence and gate over a portion of an easement that was the only existing driveway to the plaintiff's residence on the adjoining property. The trial court found that the gate was not necessary for the defendants' use and enjoyment of their property, and held that the defendants' erection of the gate constituted an unreasonable interference with the plaintiffs' right to use the easement. The defendants appealed. We affirm, finding that, although the gate may not have been an unreasonable interference with the plaintiffs' right to use the easement, the evidence does not preponderate against the trial court's finding that it was not necessary for the defendants' use and enjoyment of the property.

**Rule 3 Appeal; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Gary Vandever, Lebanon, TN, for the appellants, Richard C. Poulton and Annette L. Poulton.

Tommy Edmondson, Nashville, TN, for the appellees, Rick A. Hughes and Lisa J. Hughes.

**OPINION**

This lawsuit tests the adage "good fences make good neighbors," or in this case, good dogs. Defendants/Appellants Richard and Annette Poulton ("Poulton") and Plaintiffs/Appellees Rick and Lisa Hughes ("Hughes") live next door to each other in Wilson County, Tennessee. The Hughes had an easement across the Poultons' property for the only driveway to their residence. Until the events

which led to this litigation, the boundary line between the two parcels of property was unfenced, and the neighbors peaceably coexisted.

The genesis of this litigation occurred on May 4, 2003, when an altercation took place between the Hughes' dog and the Poultons' dog. Rico, the Hughes' fifteen-pound Jack Russell Terrier, was apparently fond of bunny rabbits. Spice, the Poultons' seventy-five pound Akita-mix, shared Ricco's affinity for rabbits. When Rico caught a baby bunny rabbit on May 4, 2003, Spice noticed and proceeded to aggressively investigate. His subsequent charge from the Poultons' yard across the property line into the Hughes' yard forced Rico into a fervent defense of his prize catch. The ensuing fracas between the two dogs was violent, and proved quite traumatic for the children and adults in attendance. Unfortunately for Rico, he appears to have received the worst of the confrontation, and ultimately required $279.80 in medical treatment.[1] Not surprisingly, the altercation between the two dogs led to hard feelings between the Hughes and the Poultons.

The Hughes own lot 26 in the Fountain Wood Subdivision in Wilson County, and the Poultons own seven acres on lot 25 in the same subdivision. Both tracts of land share a common drive to access their properties from a public road. The common drive is located on the Poultons' property. The drive splits into a "Y," with one portion leading to the Hughes' residence, and the other portion leading to the Poultons' residence. A creek runs parallel to the public road in front of both homes, and the Poultons' property is the only one of the two with a bridge for crossing the creek. Therefore, the shared drive is the only means of ingress and egress for both properties.[2]

The shared drive was created by a previous owner of the two properties. After the property was divided, and two distinct properties created, the former owner created an easement for the benefit of lot 26 (eventually the Hughes' estate) to access the public road across the bridge on lot 25 (eventually belonging to the Poultons). The conveyance of the property to the Hughes specified that it was subject to "an easement for Driveway and waterline granted for use and benefit of Tract No. 26 across a portion of Tract No. 25, of record at Deed Book 381, page 443, dated November 4, 1980." The conveyance of the servient estate to the Poultons contained the same language. A detailed metes and bounds description of the easement provided that it would encompass an area of 300 feet by 120 feet, and would perpetually run with the land. Neither the existence, size, purpose, nor validity of the easement is at issue in this litigation.

After the May 4, 2003, confrontation between the parties' dogs, the Poultons began to construct a fence between the two properties. It is unclear whether the fence was technically located on the Poultons' property, on the property line itself, or on the Hughes' property. Regardless, the fence ran alongside the property line, with a gate over the portion of the drive that split toward the Hughes' residence. As erected, the fencing did not enclose the Poultons' yard, it simply ran along

---

[1] The record contains no indication of the fate of the unfortunate baby rabbit.

[2] See attached exhibit for an illustration of the easement.

the boundary line between the two properties. Initially, the gate across the driveway measured nine feet, eight inches, in width, which permitted the Poultons' vehicle to enter or exit their property.

In response to the construction of the gate, the Hughes filed a lawsuit in the Wilson County Chancery Court, asserting that the gate unreasonably interfered with their right of passage across the driveway easement, and that the gate was not necessary for the preservation and use of the Poultons' estate. The Hughes' prayer for relief sought an injunction prohibiting the Poultons from interfering with the Hughes' use of the driveway and requiring the Poultons to move the posts of the gate so that the entrance would be wider. In addition, the Hughes requested that the Poultons be enjoined from allowing their dog to roam freely on the Hughes' property. Finally, the Hughes sought punitive damages, alleging that the Poultons' actions in constructing the fence and gate were motivated by spite and malice.

After filing the complaint, the Hughes filed a motion requesting a temporary injunction to require the Poultons to remove the gate. In support of their motion for a temporary injunction, the Hughes attached an affidavit asserting that one of their children had medical issues and was frequently in need of medical attention. The Hughes' affidavit asserted that, on at least one occasion since the erection of the fence, an ambulance coming to the Hughes' home experienced difficulty negotiating the narrow opening for the gate leading into the Hughes' property and as a result was delayed in its arrival.

On November 4, 2003, pending a full hearing on the matter, the trial court granted the Hughes' request for a temporary injunction, and ordered the Poultons to remove the posts for the gate and widen the gate from nine feet to no less than fifteen. Moreover, the trial court ordered the Poultons to cease all construction of the fence and proposed gate pending resolution of the lawsuit.

A bench trial was held on March 15, 2004. There was extensive testimony at trial about the canine combat on May 4, 2003, as well as prior incidents in which the Poultons' dog Spice came onto the neighbors' property with untoward consequences. It was undisputed that the Poultons' decision to erect the fence and gate arose from the Hughes' understandable insistence that Spice be prevented from coming into their yard, and the Poultons gave unrefuted testimony that, initially, the Hughes did not oppose the idea of fencing and a gate.

Prior to installing the fence, the Poultons did not have the property surveyed to ensure that the fence did not encroach on the Hughes' property; however, Mr. Hughes testified that the fence appeared to have been erected "down the property line." The location and dimensions of the driveway easement were not in dispute. The Hughes testified that, regardless of the width of the gate, they did not want a gate across the driveway by which they accessed their property. The Hughes did, however, want Spice contained to the Poultons' property.

Mr. Poulton testified that he and his son put in a portion of the fencing he intended to erect, and put in a gate. He said that he purchased additional fencing and intended to enclose more of his

property[3] but stopped after entry of the November 2003 order temporarily enjoining the Poultons from erecting a gate across the Hughes' driveway easement. Mr. Poulton testified that he wanted, at some point, to have horses on his property, and to have fencing around his entire property, allowing the horses access to the creek running in the front of the parties' front yards. He said he had never owned horses before, and was uncertain about when he would acquire them or how many or what kind he would have. Mr. Poulton emphasized that he wanted fencing and a gate between the parties' properties so that they could let their dog Spice out of the house and into the yard without bothering neighbors.

After hearing the testimony, the trial court summed up the legal standard as requiring that the Poultons, as owners of the servient estate, establish that the gate across the Hughes' easement was necessary for the Poultons' use and enjoyment of their land, and that the gate did not unreasonably interfere with the Hughes' right of passage. In his oral ruling, he commented that there were other ways to restrain a dog, and observed that Mr. Poulton had indicated that he would fence the entire property if he put horses on his land. The trial judge noted, however, that he did not yet have horses and had fenced only a portion of the boundary line between the parties' properties. Additionally, the trial judge said, ". . . if you put a gate in there, it would not keep the dog in. The dog can walk to the end of the fence . . . and just walk around it." Meanwhile, he said, the Hughes would be required to open and close the gate every time they entered or exited their yard. In light of this, the trial court made the following findings of fact and conclusions of law: the Hughes hold a 300 foot by 120 foot easement over the Poulton's property for a driveway, water line, and water meter; that the Poultons, as the owners of the servient estate, do not have the right to build a 300 foot fence to prohibit the Hughes from entering the easement; that the Poultons' dog, Spice, poses a threat to the Hughes and should be restrained from entering the Hughes' property; that the Poultons did not prove that the gates over the Hughes' property was necessary for the Poulton's use and enjoyment of their property; and, that a gate would unreasonably interfere with the Hughes' right of passage and use of the easement. Thus, the court enjoined the Poultons from placing a gate over the Hughes' portion of the driveway and interfering with the Hughes' use of the easement. Additionally, the Poultons were enjoined from allowing their dog to roam unrestrained, and ordered to leave a distance of no less than fifteen feet between posts on either side of the Hughes' portion of the driveway. The trial court declined to award the Hughes punitive damages, finding that the Poultons lacked the requisite malice or intent to support a punitive damages award. The Poultons now appeal.

On appeal, the Poultons raise two issues for resolution: (1) whether the Chancellor erred in ordering the Poultons to remove the gate across the driveway; and, (2) whether the Chancellor erred in finding that the Poultons did not have a right to build a fence between the properties along the easement. The Hughes argue on appeal that the Poultons acted with sufficient malice, intent, recklessness, or oppression to support an award of punitive damages, and that the trial court erred in declining to award punitive damages.

[3] Both the Poultons' attorney and Mr. Poulton allude to fencing "this back section," apparently indicating to the trial court on an unnamed exhibit. Consequently, this Court is unable to decipher from the testimony where Mr. Poulton intended to install the additional fencing.

In a non-jury trial such as this, the trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). The trial court's conclusions of law, however, are reviewed *de novo*, with no presumption of correctness. **Carter v. Patrick**, 163 S.W.3d 69, 74 (Tenn. Ct. App. 2004).

As the trial court noted, in Tennessee, the general rule is that an owner of a servient estate may utilize a gate over a right-of-way if the gate is necessary for the use and enjoyment of the owner of the servient estate, and if the gate does not unreasonably interfere with the dominant estate's right of passage over the easement. **Cole v. Dych**, 535 S.W.2d 315, 320 (Tenn. 1976); **Cooper v. Polos**, 898 S.W.2d 237, 242 (Tenn. Ct. App. 1995); **Myers v. Wilson**, 2000 WL 210266, *2 (Tenn. Ct. App. Feb. 24, 2000). An express provision in a deed establishing, or granting the use of, an easement can limit the availability of such a gate. **Foshee v. Brigman**, 129 S.W.2d 207, 208 (Tenn. 1939); **Myers**, 2000 WL 210266 at *2-3. However, a deed that is silent on the availability of gates will not prohibit the utilization of a gate to obstruct the easement, so long as the gate does not unreasonably interfere with the right of passage. **Foshee**, 129 S.W.2d at 208 (declaring that the prevailing rule is that "[u]nless it is expressly stipulated that the way shall be an open one or it appears from the terms of the grant or circumstances that such was the intention, the owner of the servient estate may erect gates across the way.").

In the instant case, it is undisputed that the language in the document creating the easement does not prohibit the Poultons' erection of the gate. None of the conveyances, deeds, or other written instruments offered for proof of the easement at trial contain any language limiting the availability of a gate. Consequently, as did the trial judge, we focus on the application of the **Cole v. Dych** two-part test requiring proof of necessity and the absence of unreasonable interference.

The reasonableness of the interference requires a totality determination, made on a case-by-case basis. **Reider v. Orme**, 68 S.W.2d 960, 963 (Tenn. Ct. App. 1933). The reasonableness determination requires the court to consider the use of, and purpose for, the easement in question. **Ogle v. Trotter**, 495 S.W.2d 558, 564 (Tenn. Ct. App. 1973). Although a gate across the Hughes' driveway would unquestionably cause some delay each time the Hughes sought to enter or exit their property, the focus is on whether it would hinder their ability to use the easement for its contemplated purpose. **See Walker v. Magic Investments, Inc.**, 1987 WL 7722 *1–2 (Tenn. Ct. App. March 12, 1987) (ruling that locked gates blocking the right of passage to a business were more than a mere inconvenience, and were therefore an unreasonable interference with the right of way). If the gate were necessary to keep the Poultons' dog on their property, it is doubtful that such a gate would be deemed an unreasonable interference with the Hughes' use of their driveway easement.[4]

---

[4]At the outset of the trial, the trial judge addressed the Hughes:

Now I understand your situation that that's going to be inconvenient to have to stop, get out and open that gate. . . . Because when I was little, we used to have to do it all the time. And, quite often that was my job. And, I hated getting out and doing it all the time.

The issue, then, becomes whether the gate is necessary for the Poultons' use and enjoyment of their property.

The Poultons, of course, have a right to allow their dogs to roam freely on their own property, including the easement, so long as it does not unreasonably interfere with the Hughes' use of their property and their driveway easement. The trial judge concluded that the fencing that the Poultons planned to immediately erect would be ineffectual to keep the Poulton's dogs off of the Hughes' property. The evidence in the record does not preponderate against this conclusion. Mr. Poulton testified that, at some undetermined point in the future, he hoped to have horses on their property, at which time he would put fencing around the entire perimeter. He did not, however, indicate that he had immediate plans to do so. Meanwhile, the fencing in place at the time of trial, which ran only along the property line between the Hughes' and Poulton's properties, was found by the trial court to be inadequate for the purpose of keeping the dog out of the Hughes' yard. The trial judge observed that the dog could just walk down to the end of the fence and enter the Hughes' property from either the front or the back. Mr. Poulton testified that he stopped erecting fencing after entry of the trial court's order prohibiting the use of a gate across the Hughes' driveway, pending trial, noting that the fencing was not useful without a gate. His testimony appeared to indicate to the trial court the additional areas he intended to fence, perhaps pointing to an unnamed exhibit. At any rate, his testimony in the appellate record does not show the additional areas he planned to fence. Under these circumstances, we cannot conclude that the trial court erred in finding that the fencing the Poultons intended to erect would be inadequate to achieve the stated objectives, and therefore the gate across the Hughes' driveway easement was unnecessary.[5]

The Poultons contend that the trial court erred in holding that they did not have a right to build a fence between the parties' properties. The trial court held that the Poultons "as owners of the servient estate do not have a right to build a three hundred foot fence to prohibit [the Hughes] from entering their easement." Therefore, the trial court did not prohibit the Poultons from erecting a fence between the parties' properties, only from erecting fencing that would keep the Hughes from utilizing the driveway to enter their property. This issue is without merit.

Finally, the Hughes raise on appeal the issue of punitive damages, and contend that the trial court erred in finding that the Poultons did not act with sufficient malice to support an award of punitive damages. The Hughes assert that the Poultons lacked any compelling reasons for erecting the fence. However, a substantial portion of the trial testimony concerned the need to keep the Poultons' dogs off of the Hughes' property, and the testimony indicated as well that the Hughes initially supported the Poultons' proposal to fence their property. From our review of the record, we cannot find that the evidence preponderates against the trial court's conclusion that the Hughes were not entitled to punitive damages.

---

[5]As noted by the trial court below, this holding is not a judicial determination that the Poultons are prohibited from fencing their property in a manner that would enable them to enjoy the full benefit of their property, including an appropriate gate, should they decide in the future to do so.

The decision of the trial court is affirmed. Costs on appeal are assessed one-half to Defendants/Appellants Richard Poulton and Annette Poulton, and their surety, and one-half to Plaintiffs/Appellees Rick A. Hughes and Lisa J. Hughes, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE