IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 21, 2011 Session

# VICTOR W. ISAAC, M.D. v. THE CENTER FOR SPINE, JOINT, AND NEUROMUSCULAR REHABILITATION, P.C.

**Appeal from the Chancery Court for Davidson County**
**No. 09-81-IV      Russell T. Perkins, Chancellor**

---

**No. M2010-01333-COA-R3-CV - Filed June 1, 2011**

---

In this employment contract dispute, the plaintiff seeks to recover a bonus from his former employer. He asserts the defendant breached the contract by failing to pay a bonus as provided in the employment agreement; alternatively, he asserts a claim for promissory fraud. The trial court summarily dismissed plaintiff's breach of contract claim. Following a bench trial on the promissory fraud claim, the trial court ruled in favor of the defendant and ordered plaintiff to pay defendant $64,471.86 in attorney fees pursuant to the employment agreement. We affirm and remand with instructions that the defendants be awarded reasonable and necessary attorney fees incurred on appeal.

**Tenn. R. App. P3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Anne C. Martin, Nashville, Tennessee, for the appellant, Victor W. Isaac, M.D.

H. Rowan Leathers, III, for the appellee, The Center for Spine, Joint, and Neuromuscular Rehabilitation, P.D.

## OPINION

The plaintiff, Victor W. Isaac, M.D., is a licensed physician. He is board certified in physical medicine rehabilitation and pain management, and is a fellow in the American Academy of Physical Medicine and Rehabilitation. The defendant, the Center for Spine,

Joint, and Neuromuscular Rehabilitation, P.C. ("CSJNR"),[1] is a physical rehabilitation center and pain management clinic with offices in Hermitage, Tennessee and Brentwood, Tennessee. Son D. Le, M.D., founded CSJNR in 2002, and currently serves as its president and CEO. He is also a licensed physician, board certified in physical medicine rehabilitation and pain management.

In 2006, in order to keep up with the growing patient demand and to expand, CSJNR placed advertisements in several medical journals, seeking to hire an additional physician. Dr. Isaac, who was employed by a competing firm, Pain & Spine Consultants, Inc., submitted his curriculum vitae in response to one of CSJNR's ads. Soon thereafter, Dr. Le contacted Dr. Isaac to set up an interview. On July 25, 2006, after several discussions between Dr. Le and Dr. Isaac, Dr. Isaac entered into a one-year employment agreement with CSJNR ("the Agreement"), with automatically renewing one-year terms, unless terminated with prior notice by either party.

The Compensation Section of the Agreement provided that Dr. Isaac would receive a base salary of $225,000, as well as a bonus. The provisions of the Agreement concerning the bonus provide:

> b. **Bonus**. In addition to the Base Salary payable hereunder, the Company, in its sole discretion, may pay to Physician an annual performance based bonus ("Bonus"). Any such Bonus awarded to Physician shall be payable within sixty (60) days after the end of each one (1) year period following the Commencement Date of this Agreement. The Bonus is calculated as a percentage of the amount of total actual collections received by the Company for the Physician's services over $500,000.00 (subject to refunds and debit adjustments to or by third party payers) over a twelve month period of employment. This bonus shall be 30% of net collections beyond $500,000 for the first year and will be increased to 40% of net collections beyond $500,000 for the years thereafter.
>
> c. Physician must be employed by the Company on July 31, 2007, or pertinent anniversaries thereafter if this Agreement is renewed, in order to be eligible to receive any applicable Bonus payment. The Bonus shall not be prorated and paid for any partial year of performance.

In October 2007, Dr. Isaac requested an increase in his base salary. Dr. Le prepared a modified employment contract proposal on behalf of CSJNR, providing for a $25,000 raise,

---

[1] The practice uses the acronym SJNMR; however, CSJNR was used throughout the proceedings.

from $225,000 to $250,000; however, the proposed contract also provided that the benchmark for bonus eligibility would be increased from $500,000 to $625,000. Dr. Isaac rejected the proposed increase in the bonus threshold and did not sign the new agreement. Therefore, the 2006 Agreement remained in effect for Dr. Isaac's second year of employment.

Thereafter, tension began developing between Dr. Isaac and Dr. Le. According to Dr. Le, Dr. Isaac was unwilling to work additional hours to assist Dr. Le and the other providers and failed to provide adequate documentation of his work. Nevertheless, Dr. Le found Dr. Isaac to be an excellent physician and a likeable person, and Dr. Le believed Dr. Isaac had the potential to improve in his problem areas. Moreover, CSJNR needed Dr. Isaac to keep up with the workload. As a result, despite Dr. Le's concerns and the fact that Dr. Isaac did not sign the new employment agreement, CSJNR began paying Dr. Isaac the higher base salary.

Not long into his second year at CSJNR, Dr. Isaac informed Dr. Le that he was interested in becoming an equity partner in the practice. Dr. Le then hired Glenda Copeland, a human resources consultant for small businesses, to advise him on how to proceed with Dr. Isaac as well other emerging personnel issues in the growing practice. Ms. Copeland and her assistant, Judy Marsh, held a meeting on April 10, 2008, with Dr. Isaac and Dr. Le. During this meeting, Dr. Le specifically outlined what he expected out of a partner, and put Dr. Isaac on a 90-day improvement plan, after which time Dr. Le would re-evaluate whether taking Dr. Isaac on as an equity partner was right for CSJNR.

Dr. Isaac met with Ms. Copeland and Ms. Marsh again on July 24, 2008, one week before the completion of his second year of employment at CSJNR, to review his performance during the 90-day improvement/evaluation period. At the conclusion of the meeting, Ms. Copeland presented Dr. Isaac with three options. The first option was a traditional equity partnership track, and the second option was a "Work/Life Balance Partnership" track, which was more akin to an employee/employer relationship. Dr. Isaac's third option was to leave CSJNR on October 31, 2008.

The next meeting was in mid-September 2008, at which time Dr. Isaac informed Ms. Copeland that he intended to leave the practice at the end of October. In the weeks leading up October 31, Dr. Isaac inquired about his bonus several times with Ms. Copeland. During an exit interview conducted shortly before his last day, Ms. Copeland informed Dr. Isaac that Dr. Le decided not to pay a bonus to Dr. Isaac for his second year of employment.

On October 31, 2008, Dr. Isaac left CSJNR and immediately returned to work for his former employer, Pain & Spine Consultants in Brentwood, Tennessee.[2]

Dr. Isaac filed suit against CSJNR in the Davidson County Chancery Court on January 15, 2009, claiming breach of contract, quantum meruit, and promissory fraud. Dr. Isaac claimed that his net collections during his second year at CSJNR totaled $684,593.13, making him eligible to receive a bonus of $73,837.26. CSJNR filed an Answer, denying all liability. CSJNR also asserted a counterclaim against Dr. Isaac for breach of Section 11(b) of the contract, which prohibited Dr. Isaac from soliciting CSJNR patients or employees for two years following the termination of his employment. The counterclaim alleged that Dr. Isaac had solicited several patients and two CSJNR employees to follow him to Pain & Spine Consultants.

Dr. Isaac later voluntarily dismissed his claim for quantum meruit. On March 1, 2010, CSJNR voluntarily dismissed its counterclaim. CSJNR then moved for summary judgment on Dr. Isaac's two remaining claims. The trial court summarily dismissed Dr. Isaac's breach of contract claim but denied summary judgment on the promissory fraud claim. A bench trial was held on May 10, 2010. The trial court found that Dr. Isaac had failed to demonstrate promissory fraud and dismissed the sole remaining claim.

CSJNR then filed a motion for $98,831.32 in attorney fees, citing a provision of the Agreement which provided that the "prevailing party" could recover its "reasonable attorney's fees." Dr. Isaac opposed the motion. The trial court determined that CSJNR was the prevailing party, and after excluding attorney fees associated with CSJNR's counterclaim and further reducing the award to account for "some duplication, . . . and the equities," awarded CSJNR $64,471.86. Dr. Isaac filed a timely appeal.

## ISSUES

Dr. Isaac presents three issues for our review. He contends there were genuine issues of material fact concerning whether Dr. Le violated the duty of good faith and fair dealing in denying the bonus, and as a result, the trial court erred in summarily dismissing his breach of contract claim. Second, he contends the trial court erred by finding that Dr. Le did not fraudulently promise payment of the bonus to Dr. Isaac. Third, he asserts CSJNR is not entitled to recover its attorney fees because it was not the "prevailing party"; alternatively,

---

[2]Dr. Le had also worked for the Pain & Spine Consultants before opening CSJNR and, ironically, left when he was not offered the option to become an equity partner.

he argues the award of $64,471.86 was excessive and should be reduced. We will discuss each issue in turn.

## BREACH OF CONTRACT

Finding that payment of the bonus "was entirely discretionary" and that "Dr. Le was the sole decision maker" on behalf of CSJNR, the trial court granted summary judgment in favor of CSJNR on Dr. Isaac's breach of contract claim. Dr. Isaac contends this was error because CSJNR was bound by the implied duty of good faith and fair dealing to pay Dr. Isaac the bonus when Dr. Isaac met the income threshold to be eligible for a bonus, the "sole discretion" language in the Agreement notwithstanding. For its part, CSJNR insists the Agreement expressly afforded it absolute discretion to pay or not pay the bonus; thus, it did not fail to act in good faith in denying payment of the bonus to Dr. Isaac.

The relevant provision in the Agreement appears in subparagraph "b." of the Compensation Section, titled "Bonus." The first sentence expressly states: "In addition to the Base Salary payable hereunder, *the Company, in its sole discretion, may pay to Physician an annual performance based bonus* ("Bonus")." (Emphasis added). The remainder of the Bonus provision states:

> Any such Bonus awarded to Physician shall be payable within sixty (60) days after the end of each one (1) year period following the Commencement Date of this Agreement. The Bonus is calculated as a percentage of the amount of total actual collections received by the Company for the Physician's services over $500,000.00 (subject to refunds and debit adjustments to or by third party payers) over a twelve month period of employment. This bonus shall be 30% of net collections beyond $500,000 for the first year and will be increased to 40% of net collections beyond $500,000 for the years thereafter.

In Tennessee, the common law imposes a duty of good faith in the performance of contracts. *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996). It is an implied-in-law covenant by each party to perform the contract in good faith. *Barnes & Robinson Co. v. OneSource Facility Servs.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006). As this court has stated, the duty has a two-fold purpose:

> First, it honors the contracting parties' reasonable expectations. Second, it protects the rights of the parties to receive the benefits of the agreement they entered into. *The implied obligation of good faith and fair dealing does not, however, create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.*

*Id.* at 642-43 (quoting *Goot v. Metro. Gov't of Nashville and Davidson County*, No. M2003-01013-COA-R3-CV, 2005 WL 3031638, *7 (Tenn. Ct. App. Nov. 9, 2005)) (internal citations omitted) (emphasis added).

"The extent of the duty to perform a contract in good faith depends upon the individual contract in each case." *Barnes & Robinson Co.*, 195 S.W.3d at 642. Thus, whether a party acted in good faith in the performance of a contract is measured by the terms of the contract. *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 91 (Tenn. Ct. App. 1988); *see also Largen v. Cracker Barrel Old Country Store, Inc*., E1999-01006-COA-R3-CV, 2000 WL 375230, at *8 (Tenn. Ct. App. Apr. 13, 2000). Furthermore, "[p]erformance of a contract according to its terms cannot be characterized as bad faith." *Wallace*, 938 S.W.2d at 687.

"In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable." *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987). The relevant provisions "should be construed as in harmony with each other . . . so as to avoid repugnancy between the several provisions of a single contract." *Park Place Ctr. Enters., Inc. v. Park Place Mall Assocs., L.P.,* 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992).

Looking to the pertinent language of the Agreement between Dr. Isaac and CSJNR, it is readily apparent that payment of a bonus to Dr. Isaac was neither mandatory nor guaranteed; rather, the express language of the Agreement provides that payment of the bonus was permissive and subject to the discretion of CSJNR. This is evident from the clear and unambiguous language the parties used in the Agreement: "the Company, *in its sole discretion, may pay* . . . an annual performance based bonus." (Emphasis added). *See Sanford Realty Co. v. City of Knoxville,* 110 S.W.2d 325, 327 (Tenn. 1937) (stating that the word "may" is permissive and confers discretion). The Agreement goes on to state that "[a]ny such Bonus *shall* be payable within sixty (60) days" after the end of each year of employment. It also explains how the Bonus "*is* to be calculated." Although these provisions are mandatory, they only become operative in the event CSJNR actually awards a bonus. These provisions do not limit CSJNR's discretion when determining whether to award a bonus. Our decision is consistent with Dr. Isaac's own deposition testimony, in which he stated that he understood the terms of the Agreement, and specifically, that he understood the phrase "in its sole discretion" to mean that it was "up to Dr. Le [CSJNR] to pay this bonus or not."

As this court held in *Barnes & Robinson Co*, the implied duty of good faith does not create new or different contractual rights and it may not be used to circumvent or alter the specific provisions of an agreement. 195 S.W.3d 637 at 643. However, for this court to construe the Agreement in the way Dr. Isaac urges us - that the duty of good faith rendered

payment of the bonus mandatory - we would have to modify the rights and responsibilities to which the parties explicitly agreed and circumvent the express and unequivocal language of the agreement. We are not permitted to do either. *See id.* The parties agreed that if Dr. Isaac reached certain benchmarks in his net collections, he would be *eligible* to receive a bonus. They agreed on how to calculate the bonus in the event CSJNR decided to award it. Last, they specifically agreed that CSJNR had *sole discretion* in determining whether to actually award the bonus. These were the terms to which the parties agreed, and which were adhered to in this case. Accordingly, we affirm the trial court's grant of summary judgment to CSJNR on Dr. Isaac's breach of contract claim.

## PROMISSORY FRAUD

Dr. Isaac's claim for promissory fraud survived summary judgment but not a bench trial. At the conclusion of the bench trial, the court determined that Dr. Isaac "did not meet his burden of proof or establish the elements of promissory fraud" and awarded judgment in favor of CSJNR.

Dr. Isaac argues that the trial court's findings are not supported by the record. Specifically, he contends that there are contradictions between Dr. Le's deposition testimony, parts of which were read into the record at trial, and his testimony during trial. Dr. Isaac asserts that when these contradictions are considered along with the rest of the proof, it becomes clear Dr. Le decided not to pay Dr. Isaac a bonus early in Dr. Isaac's second year, yet he continued to encourage Dr. Isaac to work harder and be more productive in order to be eligible for a bonus. Dr. Isaac also asserts that he suffered harm as a result of Dr. Le's representations, in that he worked long, difficult hours, and continued his employment at CSJNR when he could have sought work elsewhere, under the belief he would be paid the bonus.

Because this claim was decided following a bench trial, we review the record de novo with a presumption that the trial court's factual findings are correct, unless the preponderance of the evidence indicates otherwise. Tenn. R. App. P. 13(d). Moreover, if some of the trial court's factual findings are based on its determinations of the credibility of witnesses, we afford great weight to those credibility determinations, and will not reverse such determinations absent clear evidence to the contrary. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). We review the trial court's conclusions of law de novo without a presumption of correctness. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002).

In order to establish a claim for promissory fraud in Tennessee, a plaintiff must prove the following elements: "(1) an intentional misrepresentation of a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard to its truth; (3) an

injury caused by reasonable reliance on the statement; and (4) a promise of future action with no present intent to perform." *Houghland v. Houghland*, No. M2005-01770-COA-R3-CV, 2006 WL 2080078, at *3 (Tenn. Ct. App. July 26, 2006) (citing *Taylor v. Butler*, No. W2002-01275-COA-R3-CV, 2003 WL 21026938 (Tenn. Ct. App. Apr. 24, 2003)); *see also Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978); *Carter v. Patrick*, 163 S.W.3d 69, 77 (Tenn. Ct. App. 2004); *Dobbs v. Guenther*, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1992).

It is essential to recognize that, in the context of a claim of promissory fraud, "'the mere fact that the promisor failed to perform the promised act is insufficient by itself to prove fraudulent intent.' This is because . . . 'not every broken promise starts with a lie.'" *Styles v. Blackwood*, No. E2007-00416-COA-R3-CV, 2008 WL 5396804, at *7 (Tenn. Ct. App. Dec. 29, 2008) (citing *Am. Cable Corp. v. ACI Mgmt., Inc.*, No. M1997-00280-COA-R3-CV, 2000 WL 1291265, at *5 (Tenn. Ct. App. Sept. 14, 2000) ("Failure to perform a promise, standing alone, is not competent evidence that the promisor never intended to perform.")); *see also Stacks v. Saunders*, 812 S.W.2d 587, 593 (Tenn. Ct. App. 1990).

As our Supreme Court stated in *Fowler v. Happy Goodman Family*, promissory fraud will not be found where the plaintiff fails to establish that the defendant's promises and representations concerning future conduct were made "without any intention . . . to perform." 575 S.W.2d at 499. Further, a claim that is supported by nothing more than the plaintiff's "subjective belief and his unspecified 'information' in support of the claim of fraudulent intent to deceive and not to undertake performance" is insufficient. *Id.* (citing Restatement (Second) of Torts § 530, cmt. D (1977) ("The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into.")).

The relevant findings by the trial court include the fact that Dr. Le "attempted to motivate providers," including Dr. Isaac, "to produce so that they would be eligible for bonuses;" however, "Dr. Le did nothing in the second year that would operate to relinquish his discretion to deny a proposed bonus even though Dr. Isaac's production during the second year made him eligible for it;" furthermore, "Dr. Le never made an intentional misrepresentation of a material fact or a promise of future action with no present intention to perform."

With regard to Dr. Le's credibility, the trial court found that Dr. Le explained any perceived inconsistencies between his deposition and his testimony at trial: Although Dr. Le had doubts about Dr. Isaac early into Dr. Isaac's employment, he didn't know "what the

outcome [was] going to be;" although he was unsure about whether he was "going to be able to accommodate Dr. Isaac," Dr. Le wanted to continue working with Dr. Isaac to see if he could improve, and Dr. Le needed Dr. Isaac's help. Dr. Le further testified at trial that he wasn't sure of the exact time at which he made the decision not to pay the bonus, but that he knew it happened in October 2008, after Dr. Isaac notified Ms. Copeland that he was resigning. As a result of these findings, the trial court concluded:

> Although he had some lapses in attempting to recount the events of 2008, [Dr. Le] testified credibly and forthrightly at trial that he had concerns about Dr. Isaac's commitment to the practice beginning in October 2007, but that he did not make a final decision about the bonus until October 2008, which was after Dr. Isaac had given notice of his resignation.

In addition to Dr. Le's testimony, there is further proof supporting Dr. Le's assertion that he did not make the decision to withhold the bonus until after Dr. Isaac notified the practice that he intended to resign. Glenda Copeland, the human resources consultant with whom Dr. Le frequently met beginning in March 2008, testified that Dr. Le "never expressed any qualms about paying a bonus" to Dr. Isaac. She also testified she knew that "if Dr. Isaac had continued with the practice and everything, I have no doubt that [the] bonus would have been paid to him." Furthermore, as discussed, after Dr. Isaac's first year of employment, Dr. Le gave him a $25,000 raise, and subsequently offered him a path to partnership in the practice. We find it very unlikely Dr. Le, acting on the advice of Ms. Copeland, an experienced human resources consultant, took these actions while intending to deny Dr. Isaac a bonus, especially given the fact that Dr. Le knew the important of performance-based bonuses to physicians in Dr. Isaac's position.

Having thoroughly reviewed the record, we find it does not contain clear evidence contradicting the trial court's credibility findings. *See McCaleb*, 910 S.W.2d at 415. We also find that the evidence does not preponderate against the court's factual findings. *See* Tenn. R. App. P. 13(d). Further, we agree with the trial court's conclusion that Dr. Isaac failed to prove the essential elements of promissory fraud; specifically, he failed to prove that Dr. Le made a promise of future action without the present intent to perform. *See Houghland*, 2006 WL 2080078, at \*3; *see also Stacks*, 812 S.W.2d at 593. Therefore, we affirm the dismissal of Dr. Isaac's claim of promissory fraud.

## ATTORNEY FEES

Each party sought to recover attorney fees pursuant to paragraph 24 of the Agreement, which states:

-9-

In the event that either party shall maintain or commence any action or proceeding against the other party to enforce this Agreement or provision thereof, the prevailing party therein shall be entitled to recover his reasonable attorney's fees and costs incurred in connection with such action or proceeding.

The trial court found that CSJNR was the prevailing party. Dr. Isaac contends this was error because CSJNR voluntarily dismissed its counterclaim, and as such, it cannot be considered the prevailing party. Essentially, he contends that because neither side prevailed on its affirmative claims, there was no "prevailing party" as that term is defined in the Agreement.

In the context of attorney fees clauses in contracts, Tennessee courts define "prevailing party" as "the party to a suit who successfully prosecutes the action or successfully defends against it, *prevailing on the main issue*, even though not necessarily to the extent of his original contention." *Dairy Gold, Inc. v. Thomas,* No. E2001-024630COA-R3-CV, 2002 WL 1751193, at *4 (Tenn. Ct. App. July 29, 2002). In other words, the "prevailing party" is the party "who obtains some relief on the merits of the case or a material alteration in the legal relationship of the parties." *Estate of Burkes v. St. Peter Villa, Inc.* No. W2006-02497-COA-R3-CV, 2007 WL 2634851, at *4 (Tenn. Ct. App. Sept. 12, 2007).

The main issue in this case is whether Dr. Isaac was entitled to a bonus for the second year of his employment with CSJNR. The record clearly reveals that CSJNR successfully defended both claims pertaining to this issue, breach of contract and promissory fraud; thus CSJNR prevailed on the merits on the main issue. *See Dairy Gold, Inc.*, 2002 WL 1751193, at *4. We therefore affirm the trial court's finding that CSJNR was the "prevailing party" as defined in the Agreement, and that CSJNR was therefore entitled to attorney fees, the voluntary dismissal of its counterclaim notwithstanding.

Dr. Isaac also challenges the amount of attorney fees awarded. He asserts that the equities of the case and Rule 1.5(a) of the Tennessee Rules of Professional Conduct require a finding that the award was excessive. We respectfully disagree.

Absent a showing of abuse of discretion, we will not disturb a trial court's decision regarding the reasonableness of attorney fees. *Albright v. Mercer*, 945 S.W.2d 749, 751 (Tenn. Ct. App. 1996). A trial court abuses its discretion only when it applies an incorrect legal standard, or when it reaches a decision against logic or reasoning, that causes an injustice to the complaining party. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

CSJNR requested $93,362. The trial court found that CSJNR could not recover fees associated with its counterclaim, which had been voluntarily dismissed, and further reduced the award by 15% "to account for some duplication, the resolution of certain claims on summary judgment . . . and the equities." The final award of attorney fees was for $64,471.86.[3]

Counsel for CSJNR provided detailed affidavits showing attorney fees totaling $98,831.92. Dr. Isaac takes issue with the fact that this total included fees relating to CSJNR's counterclaim, as well as the fact that multiple attorneys assisted in the case for CSJNR. However, the trial court conducted a separate bench trial on the fee issue, and, as stated, subtracted all attorney fees related to CSJNR's counterclaim. The subtraction included $12,988.75 for attorney fees related to the counterclaim, $2,844.00 for paralegal fees, and $1,670.00 for "fees acknowledged as incorrectly included." The trial court then further reduced the total by 15% or $11,377.39 to account for any duplicative work.

The trial court did not apply an incorrect legal standard, and the record fails to establish that it reached a decision against logic or reasoning. Moreover, the charges for services related to CSJNR's counterclaim and for the work of additional attorneys was specifically excluded from the award. We therefore affirm the award of $64,471.86 in attorney fees to CSJNR.

Further, because CSJNR is also the prevailing party on appeal, it is entitled to recover its reasonable and necessary attorney fees incurred on appeal. We therefore remand this issue to afford the parties the opportunity to be heard as to the amount of the award, and for the trial court to make the appropriate award.

## IN CONCLUSION

The judgment of the trial court is affirmed in all respects, and this matter is remanded with costs of appeal assessed against the plaintiff, Victor W. Isaac, M.D.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[3]The trial court also awarded CSJNR $4,415.92 in discretionary costs, which Dr. Isaac does not appeal.